**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| H.S., on her own behalf and as parent and next friend of her minor child, J.S., | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **CAUSE NO. 1:08-cv-271** |
| HUNTINGTON COUNTY COMMUNITY SCHOOL CORPORATION, | ) ) ) | |
| **Defendant.** | ) ) | |

## REPORT AND RECOMMENDATION

There are two issues at the center of this declaratory judgment action: (1) does a school corporation violate the First Amendment's Establishment Clause when it permits a church association to present a released time program of religious instruction to third and fourth grade students in a mobile classroom on school grounds during school hours; and (2) does a third grade child in the school, but who is not released to that class, or his parent, have standing to challenge and enjoin that activity?

After considering the briefs and arguments of counsel at a hearing on January 21, 2009, it is recommended that at this juncture the District Court answer both questions affirmatively and enter a preliminary injunction.[1]

## I.  INTRODUCTION

H.S. is the parent of J.S., a third grade student at Horace Mann Elementary School ("Horace Mann"), and both have sued Huntington County Community School Corporation ("the School Corporation"), for declaratory and injunctive relief to stop the School Corporation from

---

[1] No evidence was submitted at the January 21, 2009, hearing.

"allowing a religious education program to engage in religious instruction of students during school hours in a trailer on school property" and from preventing any school employee's involvement in the program during school hours.[2] (Am. Verified Compl. for Declaratory and Injunctive Relief ("Am. Verified Compl.") 1.)

The present controversy involves two motions: (1) the motion for preliminary injunction filed by H.S. and J.S. (Docket # 13), which the School Corporation opposes (Docket # 26); and (2) the motion to dismiss filed by the School Corporation under Federal Rule of Civil Procedure 12(b)(1), which argues that H.S. and J.S. lack standing to bring this case. (*See* Docket # 32.)

In accordance with 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Northern District of Indiana Local Rule 72.1(d)(1)(A), (F), District Court Judge James T. Moody referred these matters to the undersigned Magistrate Judge for the issuance of a Report and Recommendation. (Docket ## 19, 38.) For the reasons provided in this Report and Recommendation, it is recommended that the motion for preliminary injunction be GRANTED, and the School Corporation's motion to dismiss be DENIED.[3]

## II. PROCEDURAL BACKGROUND

H.S. and J.S. commenced this case with the filing of a verified complaint, which was later amended, seeking a declaratory judgment. (Docket ## 1, 9.) What brings this matter before the Court now, however, is their motion for a preliminary injunction, and the contention that the School Corporation's released time program for religious education, as administered at Horace

---

[2] There is no evidence that any School Corporation employees are currently involved in the religious program at Horace Mann, and therefore counsel for the Plaintiffs indicated at the January 21, 2009, hearing that they are not presently pursuing injunctive relief on that issue.

[3] The Court wishes to express its appreciation to counsel for the excellent briefs they, and the amicus, have submitted on these issues.

2

Mann, violates the Establishment Clause of the First Amendment to the United States Constitution.[4]  (Docket ## 13, 14.)

Also before the Court is the School Corporation's motion to dismiss, in which it argues that this Court does not have jurisdiction because H.S. lacks standing to pursue this case as a taxpayer (a point the Plaintiffs concede), and because there is no showing that either H.S. or J.S. have suffered any harm because of the released time program.  (Def.'s Resp. Objecting to Pl.'s Mot. for Prelim. Inj. and in Supp. of Def.'s Mot. to Dismiss ("Def.'s Resp. Br.") 5-7.)

Concerning the merits, the School Corporation also maintains that there is no violation of the First Amendment here, and that since the Plaintiffs therefore cannot prevail, no injunctive relief should be granted either.[5]  (Def.'s Resp. Br. 7-22.)

At the urging of the Court, the parties submitted stipulated facts (Docket # 46), which form the major part of the Federal Rule of Civil Procedure 52(a)(2) findings and conclusions submitted in Section III of this Report and Recommendation.  The stipulated facts have been supplemented to the extent warranted in the record, and both they and the accompanying conclusions of law are set out in narrative fashion.

---

[4] There are eight grade schools in the School Corporation's system (Shafer Dep. 2), but the relief sought in the motion appears to be limited to the program at Horace Mann (*see* Mot. for Prelim. Inj. ¶ 2).

[5] Associated Churches of Huntington County ("ACHC"), the entity who conducts the religious instruction at issue in this case, filed an Amicus Curiae brief on January 6, 2009 (Docket # 34), in support of the School Corporation's position.  ACHC alleges that "if this Court grants Plaintiff's preliminary injunction motion, the Association's released-time program at Horace Mann Elementary School will cease to exist."  (Mot. to File an Amicus Curiae Br. 2.)

### III. FINDINGS OF FACT[6]

Indiana law provides that "[w]hen the parent of a student who is enrolled in a public school makes a written request, the principal may allow the student to attend a school for religious instruction that is conducted by . . . an association of churches . . . ." Ind. Code § 20-33-2-19(a). Indiana law further provides that if a principal grants such permission, then she "shall specify a period or periods, not to exceed one hundred twenty (120) minutes in total in any week, for the student to receive religious instruction." Ind. Code § 20-33-2-19(b).

The law also requires that the religious instruction school maintain attendance records because the students who attend are to receive the same credit they normally would receive for attending public school. Ind. Code § 20-33-2-19(c); Ind. Code § 20-33-2-19(d).

In accordance with Indiana law, the School Corporation has a policy that allows the release of students from school so they can attend a religious instruction program of no more than 120 minutes per week.[7] (Stipulated Facts ¶ 3.) Throughout the entire School Corporation, the policy takes the form of a voluntary program of religious instruction for third and fourth grade students called "By the Book," offered by ACHC. (Stipulated Facts ¶ 5.) Every year since its inception in 1946, ACHC has offered released time religious education to elementary school students in the School Corporation, and the By the Book program in particular has been in effect in its present form since 1954. (Stipulated Facts ¶¶ 6, 22.) Approximately 97% of the School Corporation's third and fourth graders participate in the By the Book program. (Stipulated Facts

---

[6] Any finding of fact deemed to be a conclusion of law is incorporated as such, and any conclusion of law deemed a finding of fact is also incorporated as such.

[7] There is no dispute that the School Corporation's policy, "Absences for Religious Instruction," complies with Indiana law. (Stipulated Facts ¶ 4.)

¶ 23.)

With parental consent, students are released from school for approximately one-half hour per week to attend By the Book's presentations. (Stipulated Facts ¶ 7.) Since approximately the late 1960s, ACHC has provided the released time education program in trailers, self-described mobile classrooms (*see* Verified Compl. Ex. 1), located on School Corporation property at various elementary schools. (Stipulated Facts ¶ 24.) ACHC owns the mobile classroom trailers and hires its own teachers. (Stipulated Facts ¶ 8.)

At Horace Mann, the mobile classroom trailer is parked in the front parking lot, about fifty feet from the school's front entrance, and in a location where visitors to the school would park if the space was unoccupied. (*See* Jan. 21, 2009, Hr'g.) At oral argument it was noted, without apparent dispute, that the mobile classroom trailer is parked adjacent to Horace Mann's playground. (*See* Jan. 21, 2009, Hr'g.) The classroom trailers are unmarked and display no religious iconography. (*See* Jan. 21, 2009, Hr'g; Verified Compl. Ex. 2.) ACHC's personnel move the mobile classroom trailers from school to school, and on occasion, they remain parked at a school overnight. (Stipulated Facts ¶ 9.) At times while on the lots, the classroom trailers are hooked up to electric utility connectors that ACHC installed. (Stipulated Facts ¶ 9.) ACHC pays for all utility expenses related to the program; the School Corporation does not dedicate any funds to the By the Book program or any other religious organization or program. (Stipulated Facts ¶¶ 9, 19.)

The School Corporation is also not involved in the By the Book program's curriculum. (Stipulated Facts ¶ 10.) The School Corporation does not set any educational guidelines for the released time program, nor does it have any say in its curriculum or in the selection or

employment of its teachers.  (Stipulated Facts ¶ 10.)  The School Corporation only interfaces with the program when it comes to the custodial and logistical care of students and any information regarding the students' participation in the program.  (Stipulated Facts ¶ 10.)  In terms of custodial care of the students, it is the School Corporation's policy to escort participating students to the door of the school where they meet ACHC personnel, who then accompany them to the classroom trailer.  (Stipulated Facts ¶ 18.)

Students who choose not to participate in the By The Book program remain in their regular classroom and do school-related work, such as completing assignments, reading, or they receive personal instruction.  (Stipulated Facts ¶ 11.)

H.S. is the mother of an eight year old child, J.S., a third grade student at Horace Mann, one of the School Corporation's elementary schools.  (Stipulated Facts ¶ 1.)  J.S. is required by state compulsory attendance laws to attend this school.  Ind. Code §§ 20-33-2-4; 20-33-2-5; 20-26-11-2.  It is also undisputed that from time to time, H.S. must attend school functions there as the parent of J.S.

On September 11, 2008, J.S. and other third and fourth graders at Horace Mann were sent by their teachers, and without parental consent, to visit one of ACHC's mobile classroom trailers located in Horace Mann's parking lot.  (Stipulated Facts ¶ 12; Jan. 21, 2009, Hr'g.)  No religious instruction took place at that time; however, each child  received a By the Book "Parent's Request Form" ("the Form").  (Stipulated Facts ¶ 12.)

The Form promotes By the Book's Christian-based educational program and contains a place for a parent to sign to allow a child's attendance.  (*See* Verified Compl. Ex. 1.)  The Form's cover depicts a cartoon-style church character holding a Bible.  (Verified Compl. Ex. 1.)

The Form tells the reader that third grade participants "focus on how to use the Bible" and "go on a journey through the Old Testament by studying lives of several Biblical heroes." (Verified Compl. Ex. 1.) The Form then explains that participating fourth graders "become familiar with the New Testament" through lessons focusing upon "the life of Jesus." (Verified Compl. Ex. 1.) The Form also makes clear that the program's textbook is the Bible. (Verified Compl. Ex. 1.)

The Form relates that By the Book classes provide students with knowledge so they can apply Bible stories to daily life, know steadfast moral values based on Scripture, locate Scripture, know the value of prayer, know and follow Jesus, and know and keep the Ten Commandments. (Verified Compl. Ex. 1.) The Form also explains that classes meet weekly during the school year and during the school day in mobile classrooms near the school. (Verified Compl. Ex. 1.) As the Form notes, children who do not attend the program remain in their regular classroom or with school personnel. (Verified Compl. Ex. 1.)

On September 12, 2008, Amy Ashcraft, the principal at Horace Mann, received an e-mail from H.S., with concerns about the Form that J.S. received the day before. (Stipulated Facts ¶ 13.) H.S. objected to the program and inquired about what the non-participating students were doing while other children were released to the By the Book program. (Stipulated Facts ¶ 13.) Ms. Ashcraft promised a reply after inquiring of J.S.'s teacher. (Stipulated Facts ¶ 13.)

The next day, H.S. sent an email to the School Corporation's Superintendent, Tracy Shafer, regarding the same issue. (Stipulated Facts ¶ 14.) She advised that her son J.S. had been taken into the trailer used for Bible classes and given a "Christian promoting recruitment pamphlet" (*i.e.*, the Form). (Stipulated Facts ¶ 14.) The Superintendent responded that he would

look into the matter and respond.[8]  (Stipulated Facts ¶ 14.)

Upon investigation, Mr. Shafer learned that J.S. and all of the third and fourth grade students at Horace Mann had indeed been taken to the mobile classroom by ACHC personnel and given the Form.[9]  (Stipulated Facts ¶ 15.)  In fact, prior to this lawsuit, the School Corporation's procedure or custom was to have the students go to the mobile classroom trailer to receive the Forms.  (*See* Jan. 21, 2009, Hr'g.)  The Superintendent also learned, however, that J.S.'s visit did not involve any discussion about religion, as no religious instruction occurs until the fourth meeting.  (Stipulated Facts ¶ 15.)

The Superintendent recognized that the manner of disbursement of the Form, and the students' visit to the trailer without parental consent, was contrary to the School Corporation's policy.  (Stipulated Facts ¶ 16.)  He apologized to H.S. for this breach of policy and advised that he would correct the procedure.  (Stipulated Facts ¶ 16.)  Superintendent Shafer has now implemented a new procedure so that students do not visit the mobile classrooms without a signed Form, and that all future disbursement of the Forms will be consistent with those of any other outside entity who desires to distribute literature.  (Stipulated Facts ¶ 17.)  In particular, in the future the Form is to be first presented to him for approval, and then disbursed and collected only through and by ACHC personnel.[10]  (Stipulated Facts ¶ 17.)

Both H.S. and J.S. object to the School Corporation allowing ACHC's mobile classrooms

---

[8] H.S. asserted in the e-mail that her son cried because he was concerned that his teacher would be upset if he did not return the Form.  (Def.'s Resp. Br. Ex. C.)

[9] The parties stipulate that J.S.'s teacher never escorted the children to the trailer.  (Stipulated Facts ¶ 18.)

[10] At this point, the Plaintiffs are not seeking an injunction concerning the procedure surrounding the distribution and return of the Forms.

on the grounds of Horace Mann for the conducting of the By the Book program during school hours. (Stipulated Facts ¶ 21.) H.S. pays property taxes in Huntington County, Indiana (Stipulated Facts ¶ 2), and is required to come to Horace Mann at certain times, such as for parent teacher conferences (Stipulated Facts ¶ 20). J.S., of course, encounters the mobile classroom at school.

Since the suit was filed, ACHC has explored the possibility of relocating its mobile classroom, but because of a nearby river, busy city streets, a scrap yard, and an ongoing business, they do not consider any of the property bordering the Horace Mann's campus to be a safe option. (Stipulated Facts ¶¶ 25, 26.) Therefore, if denied access to Horace Mann's property, ACHC would have to transport students to an off-site location, which it contends would be difficult to accomplish in the thirty minutes allotted by the School Corporation for the religious released time program. (Stipulated Facts ¶ 27.) Consequently, at present, the mobile classroom trailers continue to park on Horace Mann's parking lot during school hours on those days when religious instruction is offered. (Stipulated Facts ¶ 8.)

## IV. CONCLUSIONS OF LAW

### A. The School Corporation's Motion to Dismiss Should Be Denied Because H.S. and J.S. Have Standing.

As this Court has previously noted, "[u]nder Article III of the Constitution, a party must demonstrate standing in order to satisfy the 'case or controversy' requirement necessary to the exercise of our judicial power." *Linnemeier v. Ind. Univ.-Purdue Univ. Fort Wayne*, 155 F. Supp. 2d 1044, 1050 (N.D. Ind. 2001) (citing *Simmons v. Interstate Commerce Comm'n*, 900 F.2d 1023, 1026 (7th Cir. 1990), *cert. denied*, 499 U.S. 919 (1991)). The burden of establishing standing falls upon the Plaintiffs. *Id*. (citing *Plotkin v. Ryan*, 239 F.3d 882, 885 (7th Cir. 2001)).

To have standing to sue in federal court, a "plaintiff must allege (1) that he has suffered an injury in fact (2) that is fairly traceable to the action of the defendant and (3) that will likely be redressed with a favorable decision." *Books v. Elkhart County, Ind.*, 401 F.3d 857, 861 (7th Cir. 2005) (internal quotation marks and citations omitted) ("*Books II*").

Here, the entire issue of standing turns on whether either H.S. or J.S. can show that "an injury in fact" has occurred. This requires a brief recitation of what that phrase means in the context of an Establishment Clause claim.

The Seventh Circuit Court of Appeals has summarized an "injury in fact" as an "'invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Id*. (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). In applying these concepts to Establishment Clause cases, however, the Seventh Circuit has noted that an injury in fact, and thus standing, can arise from a government display of a religious object if the plaintiff has undertaken a "special burden" or has altered his behavior to avoid the object that gives offense. *Id*. (citing *Books v. City of Elkhart*, 235 F.3d 292, 299 (7th Cir. 2000) ("*Books I*") (compiling cases)). But a change in behavior, although sufficient to confer standing, is not a prerequisite. *Books II*, 401 F.3d at 861 (citing *Books I*, 235 F.3d at 300); *Doe v. County of Montgomery, Ill.*, 41 F.3d 1156, 1160-61 (7th Cir. 1994). In *Books I, Books II*, and *Doe*, the Seventh Circuit held that "it is enough for standing purposes that a plaintiff allege[s] that he 'must come into direct and unwelcome contact with the religious display to participate fully as [a] citizen[ ] . . . and to fulfill . . . legal obligations.'" *Id*. (citation omitted).

Although the trilogy of Seventh Circuit cases cited up to this point (*Books I, Books II*,

and *Doe*) are not Establishment Clause cases in the context of a public school, the principle that a plaintiff has standing if he is exposed to an unwelcome religious message actually derives, as *Books I* carefully notes, from a long line of public school cases involving a wide variety of religious messages, displays, or conduct. *See Lee v. Weisman*, 505 U.S. 577 (1992) (student and parent objected to planned invocations and benedictions at non-mandatory graduation ceremonies); *Wallace v. Jaffree*, 472 U.S. 38 (1985) (school children and parents objected to one-minute period of silence); *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam) (students and parents objected to posting of Ten Commandments); *School Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 205, 224 n.9 (1963) (school children and parents objected to reading of Bible in school although students could chose to be absent at that time or to not participate); *Berger v. Rensselaer Cent. Sch. Corp.*, 982 F.2d 1160, 1164 n.4 (7th Cir. 1993) (parent of school children objected to distribution of Gideon Bibles in the schools); *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 441 (7th Cir. 1992) (student objected to recitation of Pledge of Allegiance).

This brief canvassing of the applicable law of standing gets to the core of the School Corporation's motion to dismiss. As the School Corporation sees it, all the Plaintiffs have alleged is that H.S. and J.S. may occasionally see one of the ACHC mobile classrooms near the entrance to Horace Mann and its playground, but that their exposure is harmless because the trailer is devoid of any exterior religious message or iconography. Indeed, the Plaintiffs' response brief confirms that their basis for standing relies at least in part upon the proposition that they must come into regular and unwelcome contact with the trailers knowing that religious instruction is taking place within them. (*See* Pl. Resp. Br. 7.)

Consequently, the School Corporation's motion argues that neither Plaintiff has alleged any special burden or altered behavior, and to the extent they claim unwelcome exposure to a religious message or display, that too must fail because a plain, generic trailer (even one used for religious instruction) offers no message (unwelcome or otherwise) and cannot be considered a religious display or religious activity.

At the outset, it seems odd that the Plaintiffs do not even allege that because of the mobile classroom's location at the front entrance of Horace Mann they have been forced to alter their travel, or incurred some other special burden to avoid it; for example, by detouring to the back door when arriving for school or school functions.[11]  Clearly, such an allegation would likely give them a clear path to standing under Seventh Circuit precedent.  *See Books I,* 235 F.3d at 300-01 (citing *Freedom from Religion Found., Inc. v. City of Marshfield,* 203 F.3d 487, 489 (7th Cir. 2000); *Am. Civil Liberties Union v. City of St. Charles*, 794 F.2d 265, 269 (7th Cir. 1986)).

 Judging from their argument, however, the Plaintiffs do not believe they need to make any "special burden" allegation because: (1) the Supreme Court has already determined that parents and children challenging released time programs at their schools have standing, *e.g.*, *People of State of Ill. ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71, Champaign County, Ill.*, 333 U.S. 203 (1948); *Zorach v. Clauson*, 343 U.S. 306 (1952); and (2) merely coming into direct and unwelcome contact with a religious display or activity while fulfilling a government obligation is sufficient to confer standing.  *Books I*, 235 F.3d at 300 (citing *Doe*, 41 F.3d at 1160-

---

[11] Presumably, J.S., a third grade student, has limited ability to choose his route in or out of school, and it is unclear whether he can participate in recess at any other location than at the playground adjacent to the mobile classroom trailer.

61).

In any event, in a case such as this, the proper analysis concerning whether a plaintiff has standing to assert a violation of the Establishment Clause within the setting of a public school seemingly begins and ends with *McCollum*, 333 U.S. at 463, and *Zorach*, 343 U.S. at 309 n.4.

In *McCollum*, the plaintiff was a resident and taxpayer of the Champaign, Illinois, school district and a parent of a child enrolled in those schools. She challenged a joint public school and religious group program permitting privately-employed religious teachers to enter school classrooms during the school day to give thirty minutes of religious instruction to students released for that purpose. *Id*. at 462-64. Although the school board sought to dismiss the matter at the Supreme Court based on McCollum's alleged lack of standing, the Supreme Court brushed that argument aside with no more analysis than simply that it was "without merit." *McCollum,* 333 U.S. at 463.

In *Zorach*, another case challenging a released time program, this one in New York City, the plaintiffs were city taxpayers and residents, as well as the parents of children in its public schools. *Zorach*, 343 U.S. at 309. In offering a brief comment on standing, the Supreme Court noted that unlike the plaintiffs in *Doremus v. Board of Education*, 342 U.S. 429 (1952), a case challenging a New Jersey statute requiring the reading of Old Testament verses at the start of every school day and subsequently dismissed for lack of standing, there was no problem with jurisdiction because the *Zorach* plaintiffs "are parents of children currently attending schools subject to the released time program." *Zorach*, 343 U.S. at 309 n.4.

Moreover, and although not a case challenging a released time program, the Supreme Court case of *School District of Abington Township, Pennsylvania v. Schempp*, 374 U.S. 203

(1963), makes clear that when posing an Establishment Clause challenge to school practices, school children and their parents directly affected by the practices "surely" have standing to complain.  *Id*. at 225 n.9.

Consequently, it is most likely that these are the cases District Judge McKinney of the Southern District of Indiana had in mind when he noted in passing in a case quite similar to this one, but where standing was not challenged, that the plaintiff appeared to have standing both as a taxpayer and parent of a school child.  *Moore v. Metro. Sch. Dist. of Perry Twp.*, No. IP 00-1859-C-M/S, 2001 WL 243292, at *3 n.1 (S.D. Ind. Feb. 7, 2001).

Accordingly, under this clear line of cases, stretching back to *McCollum* and *Zorach,* the Plaintiffs have standing to challenge the released time program at Horace Mann.

And to the extent that the School Corporation asserts that the Plaintiffs have no standing because the mobile classroom gives no outward sign that it is a place of religious instruction, the case of *Doe v. Village of Crestwood, Illinois*, 917 F.2d 1476 (7th Cir. 1990), seems to provide the answer.  There, the Seventh Circuit found that a plaintiff had standing to challenge the constitutionality of a Catholic mass scheduled to be held within a tent in a public park during a municipally-sponsored festival.  The tent normally housed the festival's beer garden, but on this occasion its interior would contain an alter, a cross, and lighted candles during the mass.  *Id*. at 1478.  The Seventh Circuit reasoned, "Doe represents that he will stay away from the Festival while the mass is underway.  But for the mass, the tent would be used as a beer garden [during that time], so Doe suffers . . . injury . . . and has standing."  *Id*. (citing *ACLU v. City of St. Charles*, 794 F.2d 265, 267-69 (7th Cir. 1986)).

*Doe* suggests that if a plain tent converted to host religious services on public property is

enough to confer standing, as direct contact with it would be unwelcome, then certainly a plain mobile classroom used for religious instruction should be viewed the same way. The only distinction between *Doe* and the Plaintiffs here is that H.S. and J.S. do not have the option to simply stay away, given Indiana's school attendance laws. *Sherman*, 980 F.2d at 441.

Ultimately, of course, both the question of standing and the merits have less to do with the form or outward appearance of the structure, and more to do with whether the Plaintiffs can challenge and seek to enjoin the activity occurring there on public property. *Doe,* 917 F.2d at 1478; *Hawley v. City of Cleveland*, 773 F.2d 736, 739 (6th Cir. 1985) (finding that plaintiffs had standing to challenge the constitutionality of a chapel room in a municipal airport), *cert. denied*, 475 U.S. 1047 (1986). Since these Plaintiffs have standing to sue, it is recommended that the School Corporation's Motion to Dismiss be denied.[12]

### B. A Preliminary Injunction Should Issue.

The Plaintiffs request in their motion for a preliminary injunction that the School Corporation be enjoined from permitting ACHC to park its mobile classrooms on school grounds during school hours for purposes of religious instruction, as violative of the Establishment Clause. The School Corporation disputes that claim and contends that the Plaintiffs have failed to meet their burden for a preliminary injunction.

### 1.      Preliminary Injunction Standard

A preliminary injunction is a remedy for exceptional circumstances, to be used only

---

[12] H.S. also has standing to sue as J.S.'s guardian. *See Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 441 (7th Cir. 1992) ("[Minor plaintiff], obliged by the school-attendance laws to be present during the Pledge and the potential object of coercion to participate, has standing to challenge the statute. *His father has derivative standing as his guardian.*" (internal citation omitted) (emphasis added)); *see also* Fed. R. Civ. P. 17(a)(1) (providing that a guardian is a real party in interest).

when a case clearly demands it.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008).  "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase."  *Id.* at 1085-86.

A party seeking a preliminary injunction must first survive the three requirements of the threshold phase.  *Id.* at 1086.  "First, that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims.  Second, that traditional legal remedies would be inadequate.  And third, that its claim has some likelihood of succeeding on the merits."  *Id.* (citations omitted).  If the moving party meets these criteria, then the court proceeds to the balancing phase of the analysis.  *Id.*

"In this second phase, the court, in an attempt to minimize the cost of potential error, must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest[.]'"  *Id.* (internal quotation marks and citations omitted). "Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief."  *Id.*  To accomplish this, the court employs "a sliding scale approach: [t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor."  *Id.* (internal quotation marks and citations omitted).  When appropriate, the court should also balance the effects of granting or denying the preliminary injunction on nonparties, often referred to as "the public interest."  *Id.*

As the Seventh Circuit Court of Appeals has recently explained, "[t]aking into account all these considerations, the district court must exercise its discretion to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id*. (internal quotation marks and citations omitted).

### 2. Application of the Law

As discussed in this section, the Plaintiffs easily clear the three preliminary injunction threshold hurdles.

    *a.*     *If the preliminary injunction is not granted, the Plaintiffs will suffer irreparable harm for which traditional legal remedies are inadequate.*

"A First Amendment violation, even for 'minimal periods of time,' is 'unquestionably . . . . irreparable injury.'" *Moore*, 2001 WL 243292, at *6 (quoting *Kimbley v. Lawrence County, Ind.*, 119 F. Supp. 2d 856, 873-74 (S.D. Ind. 2000) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality))) (internal quotation marks omitted); *see also Doe v. Shenandoah County Sch. Bd.*, 737 F. Supp. 913, 916 n.2 (W.D. Va. 1990) (noting that although *Elrod* "involved First Amendment rights arising out of the Free Speech clause, that creates no distinction from the present [Establishment Clause] case. Only the most metaphysical could debate which is more important to the basic core of American values, religious freedom or freedom to speak."). Moreover, the School Corporation apparently does not dispute that there is an inadequate remedy at law in this instance. Consequently, the first two threshold factors of the preliminary injunction analysis are met.

b.      *The Plaintiffs are likely to succeed on the merits.*

I.      Establishment Clause Standards and Released Time Program Jurisprudence

The First Amendment demands that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," U.S. Const. amend. I, and this directive applies to the states through the Fourteenth Amendment, *Berger*, 982 F.2d at 1168 (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)). "Under the Establishment Clause, the government may not aid one religion, aid all religions or favor one religion over another." *Berger*, 982 F.2d at 1168-69 (citing *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947)).

As previously discussed, the United States Supreme Court has addressed two cases asserting Establishment Clause challenges to released time programs: *McCollum*, 333 U.S. 203, and *Zorach*, 343 U.S. 306, and a brief discussion of each will advance the analysis.

In *McCollum*, the Champaign, Illinois, public schools allowed private religious groups to come into school classrooms weekly during instructional hours to teach religious classes to students in the fourth through ninth grades. *McCollum*, 333 U.S. at 207-08. The groups employed the religion teachers at no expense to the school, but they were subject to the approval and supervision of the school superintendent. *Id*. at 208. Students who did not participate were required to go to different classrooms to continue their secular studies. *Id*. at 209. Students whose parents consented were released from their regular classes to attend the religious classes, and their attendance was reported to the school. *Id*. Parental consent was obtained through consent forms disbursed to the students by their regular teachers, but returned to the religion teachers either through the secular teachers or the students themselves. *Id*. at 207 n.2.

The United States Supreme Court found that these facts showed "the use of tax-supported property for religious instruction and the close cooperation between the school authorities and the religious council in promoting religious education." *Id*. at 209. The Court determined that the school assisted and was integrated with the program, and "this is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith[,]" falling "squarely under the ban of the First Amendment . . . ." *Id*. at 209-10 (citing *Everson*, 330 U.S. at 1). The Court emphasized that not only were the tax-supported public school buildings being used to disseminate religious doctrines, but the state was affording such "groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the state's compulsory public school machinery." *Id.* at 212.

Four years after *McCollum*, the Supreme Court again addressed the issue of released time programs in public schools. In *Zorach*, 343 U.S. 306, the Supreme Court upheld the school's released time program because unlike the situation in *McCollum*, New York City simply permitted, with parental consent, "its public schools to release students during the school day so that they *may leave the school buildings and school grounds* and go to religious centers for religious instruction[.]" *Zorach*, 343 U.S. at 308 (emphasis added). The children who were not released stayed in their classrooms, while the churches reported to the school the attendance of the participating students. *Id*. In distinguishing that situation from *McCollum*, the Court emphasized, "This 'released time' program involves neither religious instruction in public school classrooms nor the expenditure of public funds[,]" unlike in *McCollum* where "classrooms were turned over to religious instructors." *Id*. at 308-09. "No one [was] forced to go to the religious classroom and no religious exercise or instruction is brought to the classrooms of the public

schools[,]" and there was no threat of coercion, since the school authorities "do no more than release students whose parents so request." *Id.* at 311.

Ultimately the *Zorach* Court concluded:

In the McCollum case the classrooms were used for religious instruction and the force of the public school was used to promote that instruction. Here, as we have said, the public schools do no more than accommodate their schedules to a program of outside religious instruction. We follow the McCollum case. But we cannot expand it to cover the present released time program unless separation of Church and State means that public institutions can make no adjustments of their schedules to accommodate the religious needs of the people. We cannot read into the Bill of Rights such a philosophy of hostility to religion.

*Id.* at 315.

In the decades following *McCollum* and *Zorach*, a prevailing approach to evaluating Establishment Clause cases developed, as first set forth in the United States Supreme Court case of *Lemon v. Kurtzman*, 403 U.S. 602 (1971). "The so-called *Lemon* test has evolved through a series of cases such that a court must inquire (1) whether the government has the purpose of endorsing religion, (2) whether the effect of the government's action is to endorse religion, and (3) whether the policy or practice fosters an excessive entanglement between government and religion." *Berger*, 982 F.2d at 1169 (citing *County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 592 (1989)). State action violates the Establishment Clause if it fails to satisfy any of these prongs. *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

To determine whether government action has the effect of advancing religion, the "effect prong" has been analyzed under the "perception of endorsement" framework first developed in Justice O'Connor's concurring opinion in *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984). *Freedom from Religion Found., Inc. v. City of Marshfield, Wis.*, 203 F.3d at 493. "Under this test, [t]he effect prong asks whether, irrespective of government's actual purpose, the practice

under review in fact conveys a message of endorsement or disapproval." *Id*. (internal quotation marks and citation omitted). "When we find that a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is *favored* or *preferred*, the Establishment Clause has been violated." *Id*. (citations omitted) (emphasis in original).

Since its inception, the *Lemon* test has been criticized and its viability questioned, *see, e.g., Wallace*, 472 U.S. at 68 (O'Connor, J., concurring). Nevertheless, it remains the prevailing standard for analyzing Establishment Clause cases. *Books II*, 401 F.3d at 862-63 ("*Lemon* has not been overruled, and we are compelled to follow the approach it established."). Although *Zorach* and *McCollum* predate the *Lemon* test's jurisprudence, they remain authoritative, *see, e.g., Pierce v. Sullivan W. Cent. Sch. Dist.*, 379 F.3d 56 (2nd Cir. 2004) (finding the holding in *Zorach* to be controlling in a challenge to a released time program), and have been considered along with the *Lemon* test in Establishment Clause claims in the context of public schools, *see, e.g., Smith v. Smith*, 523 F.2d 121, 124-25 (4th Cir. 1975) (finding that *Zorach* is not inconsistent with the *Lemon* test ); *Moore*, 2001 WL 243292, at *3-6 (analyzing a school's released time program utilizing both *Zorach* and *McCollum* and the *Lemon* test). Thus, the parties here have quite properly analyzed this case using the principles articulated in *Zorach* and *McCollum* as well as *Lemon*. However, no matter which analysis is applied to the facts at hand, it is likely that the Plaintiffs will prevail.

    ii.    <u>Analysis of the Likelihood of Success on the Merits</u>

        a.    <u>*McCollum* and *Zorach*</u>

While both *McCollum* and *Zorach* afford useful guidance, neither purports to draw the

precise line between church and state in connection with released time cases. Certainly, if the religious instruction occurs in a public classroom and the school assists and is integrated into the program such that it provides the pupils for those classes, then an Establishment Clause violation has occurred. *McCollum*, 333 U.S. at 209-10. At the other pole, the program in *Zorach* did not offend the First Amendment because it permitted students to "leave the school buildings *and school grounds* and go to religious centers for religious instruction or devotional exercises." *Zorach*, 343 U.S. at 308 (emphasis added).

Admittedly, many of the troublesome factors cited in *McCollum* and subsequent released time cases are not present here. For instance, the School Corporation is not providing utilities or other financial support for the program; it is not involved in By the Book's curriculum or responsible for hiring and supervising its teachers; its elementary teachers do not take the students to the mobile classrooms; the method of distribution and collection of the Form is not presently challenged; and ACHC personnel are not permitted in Horace Mann's classrooms to recruit participants. *Cf. McCollum*, 333 U.S. 203; *Moore*, 2001 WL 243292 (granting a motion for preliminary injunction where released time program occurred in trailers in the school's parking lot, superintendent had input in the curriculum, school previously paid for trailers' utilities, and non-participating students were forbidden from doing school-related work during released time); *Lanner v. Wimmer*, 662 F.2d 1349 (10th Cir. 1981) (holding that a school's collection of a released time program's attendance slips violated the Establishment Clause); *Shenandoah County Sch. Bd.*, 737 F. Supp. at 913 (granting a temporary restraining order stopping a released time program that occurred in buses on school grounds, where the religious instructors entered the school to recruit students, and the public school teachers distributed and

collected the enrollment cards and encouraged participation); *Doe v. Human*, 725 F. Supp. 1503

(W.D. Ark. 1989) (holding that a public school's elective Bible classes taught in the school's

building during school hours violated the Establishment Clause), *aff'd without opinion*, 923 F.2d

857 (8th Cir. 1990), *cert. denied*, 499 U.S. 922 (1991).

Thus, the case here is essentially stripped to this ultimate question – is religious

instruction to elementary students on public school property during the school day, in a church-

owned mobile classroom, violative of the Establishment Clause?  The answer is found in the

over-arching principle articulated in *McCollum*; that is, "the use of *tax-supported property* for

religious instruction" and the "utilization of the *tax-established and tax-supported public school

system* to aid religious groups to spread their faith[,]" makes the program unconstitutional.

*McCollum*, 333 U.S. at 209-10 (emphasis added).

Furthermore, other courts have also noted that using any school property for religious

instruction, not simply classrooms, raises Establishment Clause issues.  *See, e.g., County of

Allegheny*, 492 U.S. at 591 (citing *McCollum* for the proposition that a "State may [not] allow

public-school students to receive religious instruction *on public-school premises* . . . .")

(emphasis added); *Lanner*, 662 F.2d at 1357 ("Notwithstanding continuing scholarly debate, it is

clear that released-time programs permitting attendance at religious classes *off school premises*

do not *per se* offend the establishment and free exercise clauses.") (emphasis added);

*Shenandoah County Sch. Bd.*, 737 F. Supp. at 918 ("The primary distinction between this case

and both *Smith* [*v. Smith*, 523 F.2d 121 (4th Cir. 1975)] and *Zorach* is that the religious

education is taking place on what appears to be *school property*.") (emphasis added); *Human*,

725 F. Supp. at 1507 ("In the court's view, if an evidently religious study course is taught *on

*school grounds* during regular school hours, the school is excessively entangled in it regardless of who teaches such classes.") (emphasis added).

Notably, as the Plaintiffs highlight, the School Corporation has pointed to no case upholding the constitutionality of a released time religious education program held on public school property during school hours. In any event, the facts of this case are clearly distinguishable from *Zorach* and other released time cases where the programs were upheld, since in those cases the instruction took place off-premises. *See Zorach*, 343 U.S. 306; *Pierce ex rel. Pierce v. Sullivan West Cent. Sch. Dist.*, 379 F.3d 56, 60 (2nd Cir. 2004) (upholding a released time program in part because it "involve[d] no *on-site* religious instruction") (emphasis added); *Smith*, 523 F.2d at 121 (upholding a released time program and distinguishing it from *McCollum* because it took place off school grounds).

In light of the fact that the religious education program is occurring on tax-supported, public school grounds during school instructional hours, this case is more akin to *McCollum* than *Zorach*. Consequently, the Court should find that Plaintiffs are likely to succeed on the merits of their claim.

      b.    The *Lemon* Test

Applying the *Lemon* test to the facts reinforces the conclusion that the School Corporation's implementation of its released time program violates the Establishment Clause. Although the Plaintiffs contend that the program does not survive any of the three prongs of the test, at the very least it fails to meet either the secular purpose or effect criteria.

      1.    The Secular Purpose Prong

To begin, the School Corporation has not established that allowing ACHC's mobile

classroom trailers on school property to conduct religious education has a primarily secular purpose. *See Books I*, 235 F.3d at 304 n.8 (collecting cases indicating that the burden of showing a secular purpose is on the government). "[W]e generally defer to the government's articulated purpose as long as it is not a sham." *Books II*, 401 F.3d at 863 (internal quotation marks and citation omitted). "The Supreme Court has held that government action lacks a valid secular purpose under *Lemon* only when there is 'no question that the statute or activity was motivated wholly by religious considerations.'" *Books II*, 401 F.3d at 863 (quoting *Lynch*, 465 U.S. at 680). The secular purpose requirement, however, "does not mean that the government's purpose must be unrelated to religion." *Id.* (internal quotation marks and citation omitted).

The School Corporation first argues that its "release[d] time policy maintains a primarily secular purpose in that it specifically states that 'The School Board desires to cooperate with those parents who wish to provide for religious instruction but also recognize its responsibility to enforce the attendance requirements of the State.'" (Def.'s Resp. Br. 10 (citing Shafer Aff. Ex. A).)

Indeed, as the School Corporation notes, accommodating parental desires may be an acceptable purpose for such a policy. *See Lanner*, 662 F.2d at 1357; *Smith*, 523 F.2d at 124. The problem here, however, is not the released time policy itself, but the School Corporation's *effectuation* of that policy. In other words, though the School Corporation may release the children to accommodate parental and associational scheduling needs, *see Zorach*, 343 U.S. at 313-14 ("When the state encourages religious instruction or cooperates with religious authorities *by adjusting the schedule of public events* to sectarian needs, it follows the best of our traditions.") (emphasis added), its action with respect to the By the Book program extends

beyond mere cooperation with ACHC's schedule. It affords ACHC access to the school's property (and its students) to carry out and in effect promote its religious education "ministry." (*See* Verified Compl. Ex. 1.) *See Books II*, 401 F.3d at 863 ("[T]he purpose requirement 'aims at preventing the relevant governmental decision maker . . . from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.'" (quoting *Am. Jewish Cong. v. City of Chicago*, 827 F.2d 120, 126 (7th Cir. 1987)).

The School Corporation also says that allowing the classes on school grounds advances the secular purpose of ensuring student safety. Although student safety is undeniably important, the school apparently sees its role as overseer of student safety as ending, at least in this context, when the children exit the school building, because that is where the ACHC teacher meets them.[13] (Stipulated Facts ¶ 18.) Stated simply, the school believes that getting the children safely to religious education is something for the parents or the religious program to do, and Indiana law seems to confirm that view. *See* Ind. Code § 20-33-2-19(a) (providing only that the principal "allow [a] student to attend" religious instruction). Therefore, this argument is not entitled to the usual deference. *See Books II*, 401 F.3d at 863.

### 2. The "Effect" Prong

Even if the Court were to accept that the School Corporation had a secular purpose for allowing the religious instruction to occur on school grounds, this practice nevertheless fails to satisfy the "effect" prong of the *Lemon* test, which "asks whether, irrespective of [the]

---

[13] The School Corporation's concern about student safety on school grounds seems a little selective in this context, since the Superintendent does not know exactly how the children are getting to and from the mobile classroom or the means of supervision while they do so. (*See, e.g.,* Shafer Dep. 20-22.) Moreover, although the School Corporation is probably vigilant concerning strangers coming onto elementary school grounds, it apparently knows little or nothing about the ACHC teachers, including even their identities. (*See* Jan. 21, 2009, Hr'g.)

government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Freedom from Religion Found., Inc.*, 203 F.3d at 493. The Establishment Clause is violated if a reasonable person could perceive that a government action conveys a message that a particular religion is favored or preferred. *Id.* "'Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion.'" *Am. Jewish Cong.*, 827 F.2d at 127 (quoting *Lynch*, 465 U.S. at 694 (O'Connor, J., concurring)); *see also Linnemeier v. Ind. Univ.-Purdue Univ. Fort Wayne*, 155 F. Supp. 2d 1034, 1042 n.8 (N.D. Ind. 2001) ("The law requires the court to go beyond the particularized perceptions of individuals and inquire into the mind of a reasonable observer deemed aware of the history and context of the community and forum in which the religious [speech takes place]." (internal quotation marks and citations omitted)).

Given this framework, a reasonable person is likely to conclude that the School Corporation is endorsing religion in this instance. After all, what was said of the school corporation in *Moore*, 2001 WL 243292, at *5, can be said of the School Corporation here: "[i]t allows a particular religious association access to the students at the beginning of the school year to promote its religious program [and] it allows that same association to bring trailers onto school property to conduct its religious education classes . . . ." Indeed, the School Corporation has seemingly granted ACHC a unique and unlimited license, permission to pull a mobile classroom so close to the school that to impressionable elementary school students, religious instruction appears to be on par with, perhaps indistinguishable from, their secular studies.[14] *See*

---

[14] The School Corporation argues that this case is more akin to the facts in *Sherman v. Community Consolidated School District 21 of Wheeling Township*, 8 F.3d 1160 (7th Cir. 1993). (Def.'s Resp. Br. 14-15.) In that case, the Seventh Circuit Court of Appeals found that a school did not violate the Establishment Clause by allowing the Boy Scouts of America ("BSA") to use the school's facilities for meetings and to distribute flyers in the

*Berger*, 982 F.2d at 1169-70 ("Many cases have focused on the impressionability of students in elementary and secondary schools and the pressure they feel from teachers, administrators and peers." (citing *Edwards*, 482 U.S. at 584; *Lee*, 505 U.S. at 592)). Given these facts, the Plaintiffs have established a likelihood of success under the "effects" prong of the *Lemon* test.

Because the School Corporation's practice fails to satisfy at least two prongs of the *Lemon* test, the Court need not delve into the third prong, excessive entanglement between the school system and the ACHC. *See Moore*, 2001 WL 243292, at *5. However, it may be worth noting that there is at least some authority for the notion that religious instruction occurring on school grounds during school hours conceivably involves excessive entanglement. *See Human*, 725 F. Supp. at 1507 ("In the court's view, if an evidently religious study course is taught *on school grounds* during regular school hours, the school is excessively entangled in it regardless of who teaches such classes.") (emphasis added).[15]

In sum, regardless of whether this case is evaluated under the principles of *Zorach* and *McCollum* or under the *Lemon* test, the Plaintiffs are likely to succeed on the merits of their claim.

---

school. *Sherman*, however, is distinguishable from the instant case. The BSA was simply one of many community organizations using the school's facilities and disseminating flyers in accordance with the school's policy. The school's practice here is much more likely to be perceived by a reasonable person as preferential, an outright endorsement of religion, since the mobile classroom itself offers a physical reminder that ACHC enjoys unique status with the school. Indeed, some observers may view the trailer, the program, and the school as indistinguishable.

[15] In arguing that there is no excessive entanglement in this instance, the School Corporation attempts to liken the instant facts to those of *Pulido v. Cavazos*, 934 F.2d 912 (8th Cir. 1991). In that case, the Court of Appeals for the Eighth Circuit upheld the use of mobile classroom units to provide Title I remedial services to low-income students in parochial schools. However, that case is clearly distinguishable, since the use of public school property to teach religious education is very different from the use of parochial school property to conduct remedial services. The problem here is not just that there are church-owned mobile classroom trailers on school property, but that *religious education* is occurring in those trailers during school hours.

*The balance of harm considerations favor the Plaintiffs.*

Because the Plaintiffs have passed the threshold inquiry, a balancing of several factors must be done to determine if an injunction should issue.

In this instance, there is a strong likelihood that the Plaintiffs will succeed in establishing that the School Corporation is violating their First Amendment rights, an irreparable harm.  *See Moore*, 2001 WL 243292, at \*6.  On the other hand, a preliminary injunction ordering the removal of ACHC's mobile classroom to another site would hardly affect the School Corporation, since By the Book is not the School Corporation's program.

Although the School Corporation argues that it would be harmed by an injunction requiring removal of the mobile classroom because it would jeopardize student safety (a point only conclusorily asserted), they have already ceded that responsibility to ACHC, as noted earlier.  And besides, the inconvenience to the school and students is minimal, particularly if the released time period is slightly expanded to allow for transport.  *See Moore*, 2001 WL 243292, at \*7 ("[T]o the extent students are inconvenienced by having to attend the [released time program] at a location off school property, that harm is minimal.").

The School Corporation nevertheless maintains that if the preliminary injunction is granted, Horace Mann will lose instructional time to accommodate the unspecified extra minutes required for ACHC to transport students to an off-site location.  The argument is rather transparently thin, however, since the School Corporation already has a policy that allows for up to 120 minutes a week for religious released time instruction, and thus it would seem that it has already determined that a program four times longer than the one currently offered has no detrimental effect on student education.

In short, the School Corporation faces minimal harm if a preliminary injunction is granted, while the Plaintiffs face irreparable harm in the nature of a violation of their First Amendment rights. Therefore, the balance of harm clearly favors the Plaintiffs.

Finally, the Court must consider the effect of the preliminary injunction on the public interest. Towards that end, it is argued that the injunction would frustrate the operation of a program that ACHC and many parents desire to keep in place. The issue, however, is not whether the By the Book program continues, but the narrower one of whether it must continue on School Corporation property. If the mobile classrooms are removed to a location off-site from Horace Mann, it will be up to the parents to determine whether they wish to have their children participate for a greater part of the school day. Moreover, it cannot be ignored that protection of First Amendment rights is also in the public's interest. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). In short, ACHC's inconvenience as a result of the preliminary injunction does not outweigh the harm of perpetuating a constitutional violation.

## V. CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Plaintiffs' Motion for Preliminary Injunction (Docket # 13) be GRANTED, and that the School Corporation's Motion to Dismiss (Docket # 32) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE

OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE

DISTRICT COURT'S ORDER. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir.

1995); *Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir. 1990).

      SO ORDERED.

      Enter for this 3rd day of February, 2009.

                    /S/ Roger B. Cosbey
                    Roger B. Cosbey,
                    United States Magistrate Judge